## DULUTH STORAGE & FORWARDING CO. *et al. v.* PRENTICE.

*(Circuit Court, D. Minnesota, Third Division. June 20, 1892.)*

DEED—DESCRIPTION—FLOAT.

A deed described the land conveyed as beginning at a certain rock and running thence one mile east, one mile north, and one mile south, to place of beginning, and also stated that it was the land set off to a certain Indian under a treaty with the government. The Indian had previously selected his land as "a tract one mile square, the exact boundaries of which may be defined when the surveys are made." After the deed was given, the Indian's land was located and patented so as to include four distinct but adjacent parcels, no part of which lay within the boundaries named in the deed. *Held,* that the deed was not a float, but attached to the described lands, and in the absence of mistake could not be construed to pass title to any of the patented lands.

In Equity. Bill to establish title to lands. Decree for complainants.
Statement by NELSON, District Judge:

This action was begun in April, 1890, by the Duluth Storage & Forwarding Company and the Duluth Street Railway Company on their own behalf, and also on behalf of all others similarly situated with reference to the subject of the action who might thereafter come in and be joined as parties thereto. The lands, of which those in controversy are a part, were patented in severalty, and in four distinct but adjacent

parcels, by the United States, October 23, 1858, to one Benjamin Armstrong and three other relatives of the Indian chief Buffalo.   Armstrong, having succeeded to the interest of the other patentees, conveyed an undivided one half of the entire tract to Cash & Kelly, October 22, 1859, and the other undivided half to John M. Gilman, August 31, 1864. These grantees, and those claiming under them, in 1870, caused the entire tract to be platted into town lots, about 2,600 in number, which now lie in the center of the city of Duluth.   The 577 complainants herein, who are about two thirds of all the present owners of the lots so platted, have, as to their respective lots, succeeded to the interest thus acquired by Cash & Kelly and Gilman, and unite in this action to quiet title against the defendant, who claims, adversely to the Gilman title, an undivided half of the entire tract, by virtue of a deed from Armstrong, made prior to the issuance of the patent, the origin of which adverse title was as follows:  The patents to Buffalo's relatives were issued in pursuance of the following clause in the treaty with the Chippewa Indians of Lake Superior, signed September 30, 1854:

"And being desirous to provide for some of his connections, who have rendered his people important services, it is agreed that the chief Buffalo may select one section of land at such place in the ceded territory as he may see fit, which shall be reserved for that purpose and conveyed by the United States to such person or persons as he may direct."

On the day of the treaty, Chief Buffalo appears to have made, under the foregoing clause, the following written selection, which, in February, 1856, was filed in the office of Indian affairs:

"I hereby select a tract of land one mile square, the exact boundary of which may be defined when the surveys are made, lying on the west shore of St. Louis Bay, Minnesota territory, immediately above and adjoining Minnesota Point; and I direct that the patents be issued for the same, according to the above-recited provisions, to Shaw-bwaw-skung or Benjamin G. Armstrong, my adopted son, to Mathew May-dway-gwon, my nephew, to Joseph May-dway-gwon and Anton May-dway-gwon, his sons, one quarter section to each."

September 17, 1855, the May-dway-gwons united in an assignment to Armstrong of all their interest under the treaty.   September 11, 1856, Armstrong executed to Prentice the deed upon which he bases his claim of title.   It is a quitclaim deed of an "undivided one half of all the following described piece or parcel of land situate in the county of St. Louis and territory of Minnesota, and known and described as follows, to wit: Beginning at a large stone or rock at the head of St. Louis River Bay nearly adjoining Minnesota Point; commencing at said rock and running east one mile, north one mile, west one mile, south one mile, to the place of beginning,—and being the land set off to the Indian chief Buffalo at the Indian treaty of September 30, A. D. 1854, and was afterwards disposed of by said Buffalo to said Armstrong, and is now recorded with the government documents."   Concurrently with the execution of this deed, Prentice and Armstrong joined in a contract reciting that the latter had that day deeded to the former "a certain piece of land," describing it substantially as in the deed, and agreeing that for the consideration

Prentice was to furnish Armstrong such money and provisions as might be necessary to go on and erect a house on said land and live thereon, and to assist him at Washington in perfecting his title, Armstrong at the same time agreeing to move at once upon and occupy the land. The government survey of the township in which the lands in controversy lie was not made until the year 1857. The large rock referred to in the Prentice deed was a prominent, natural landmark, and is well identified by the evidence. It is admitted that no part of the lands finally patented under the treaty and here in controversy lie within the square mile of land running east and north of said rock.

*Wm. W. Billson,* (*Geo. B. Young,* of counsel,) for complainants.

*Kitchel, Cohen & Shaw, John F. Dillon,* and *Elihu Root,* (*Samuel B. Clarke,* of counsel,) for defendant.

NELSON, District Judge, (*after stating the facts.*) This suit is brought to establish, as against the defendant, the titles derived from John M. Gilman, whose immediate grantors were Benjamin Armstrong and wife, under a deed dated August 31, 1864. The defendant's claim must stand or fall under his deed from Armstrong and wife, dated September 11, 1856. If the title of Gilman is sustained, the complainants must succeed, as they all trace title through him. Armstrong's title, conveyed by this deed, is claimed to be derived under a treaty with the Chippewa Indians in 1854 at La Pointe on Madaline island in Lake Superior, and under the selection of Chief Buffalo, according to the provisions of the treaty and appointment by Buffalo that the lands selected by him should be conveyed by the United States to Armstrong and three other relatives. The interest under the treaty of the three relatives was assigned September 17, 1855, to Armstrong. The question which must determine the rights of the parties to this controversy has been before this court in several ejectment suits brought by this defendant against persons claiming under Gilman, (see 20 Fed. Rep. 819; 43 Fed. Rep. 270;) and in one instance a case was reviewed by the supreme court of the United States and the construction by this court of the deed from Armstrong to Prentice affirmed. *Prentice* v. *Stearns,* 113 U. S. 435, 5 Sup. Ct. Rep. 547. It is true, additional testimony is taken in this suit by the parties under objections from each. The objections noted by the defendant to the testimony of Messrs. Ray, Carey, McFarland, and others are overruled. I am inclined to think this evidence is relevant. The admission of traditionary evidence in cases of boundary is admissible, and Chief Buffalo's selection under the treaty was a matter of peculiar interest to the people in general who were about to make or had made settlement upon government land in that locality, and so the declarations made by Chief Buffalo before his death, and those of Armstrong to the persons camping with him at Endion, are admissible, the former as tending to show that the Buffalo selection lays east of the large rock mentioned, and the latter being relevant as also tending to show that it did, and that Armstrong fully recognized this location, and that the deed from him to the defendant of September 11, 1856, was intended to convey an undivided one half

of a described mile square lying east of the large rock, just as it states. The written contract between the parties contemporaneous with the deed is also admissible as throwing some light on the intention of the parties when the deed was executed. I am also inclined to the opinion that the documentary evidence from the land department at Washington showing the correspondence between officials of the Indian and land department are admissible; but, giving full weight to such testimony, it cannot overthrow the conclusion which the court must reach from a consideration of all the evidence in the suit. The argument of the defendant's counsel is based upon the theory urged in the ejectment suits that the interest conveyed by Armstrong to Prentice was in the nature of a float to attach to any land afterwards patented under the treaty, and not to a specific tract. This view of the case has never been adopted by this court, and it was held adversely to the defendant in the case before the supreme court of the United States. But it is urged that there was a mistake in the east and west lines as described in the Prentice deed, and that there should be a reversal of these lines by this court, which, if done, would include a large tract of the land claimed by the complainants. The witness Ellis, who drew the deed, testifies that he inserted the starting point and the boundaries given him by Armstrong, and Armstrong himself testifies that he dictated the description by boundaries to Prentice, and I can find no evidence showing that there was a mistake in the specific boundaries. On the contrary, if we are right in the conclusion from the evidence, Armstrong expected to acquire under the treaty the square mile lying east and north of the large rock, and that is all the land he claimed. There are many minor points urged by the defendant's counsel, but, in the view taken by the court, none of them, if decided in favor of the defendant, would bar the relief claimed in the complaint. Decree ordered for the complainants.